**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**                    **21-CR-6057-DGL-MJP**

                    **v.**                              **NOTICE OF MOTION**

**SYLVESTER REED,**

                              **Defendant.**


**MOTION BY**:                    Sonya A. Zoghlin,
                                  Assistant Federal Public Defender
                                  Attorney for Sylvester Reed.

**DATE, TIME & PLACE**:           August 24, 2021, at 10:00 a.m., before the
                                  Honorable Mark W. Pedersen,
                                  United States Courthouse
                                  100 State Street, Rochester, New York.

**SUPPORTING PAPERS**:            Affirmation of Sonya A. Zoghlin, affirmed on
                                  August 5, 2021, the attachments hereto, and all
                                  prior proceedings had herein.

**RELIEF REQUESTED**:             An Order granting the relief requested herein.


Dated: August 5, 2021
       Rochester, New York


                                  /s/ Sonya A. Zoghlin
                                  Assistant Federal Public Defender
                                  28 East Main Street
                                  First Federal Plaza, Suite 400
                                  Rochester, New York 14614
                                  585-263-6201
                                  sonya_zoghlin@fd.org
                                  Attorney for Sylvester Reed


TO:    Sean Eldridge, AUSA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**                    **21-CR-6057-DGL-MJP**

                    **v.**                              **AFFIRMATION**

**SYLVESTER REED,**

_____**Defendant.**_____

     Sonya A. Zoghlin, Assistant Federal Public Defender for the Western District of New York, affirms as follows:

     1.    I am an attorney licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent Sylvester Reed.

     2.    I am familiar with this case by reasons of my investigation of this matter, conversations with my client and others, my review of the discovery material provided to date by the government, as well as other records and documents related to the investigation of this matter and to Mr. Reed's mental and physical condition following his arrest and during his interrogation.

     3.    This affirmation is submitted in support of the various forms of relief requested herein, and is based upon the facts as I know them, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the United States Constitution, and other pertinent statutes and law.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................4

II.     FACTUAL BACKGROUND ……………………………………….........4

III.    MOTION TO SUPPRESS STATEMENTS…………………….....…...12

IV.     DISCOVERY AND INSPECTION……………………………………..17

V.      BRADY………………………………………………………………..... 21

VI.     FED. R. EVID. 404(b) ................................................................ 24

VII.    FED. R. EVID. 608 & 609................................................................... 25

VIII.   DISCLOSURE OF WITNESS STATEMENTS ........................................... 25

IX.     PRESERVATION OF ROUGH NOTES .................................................... 26

X.      RESERVATION OF RIGHTS....................................................................... 27

# I.  INTRODUCTION

4.      Sylvester Reed is charged in a five count indictment involving the theft of money from two different ESL Federal Credit Union locations (518 East Ridge Road in Irondequoit and 215 Merchants Road in Rochester) on the same date, December 16, 2020. The allegations are as follows:

Count 1:    *Credit Union Robbery*, 18 U.S.C. §2113(a), 518 East Ridge Road;

Count 2:    *Entering a Credit Union with Intent to Commit a Larceny*, 18 U.S.C. §2113(a), 518 East Ridge Road;

Count 3:    *Credit Union Robbery*, 18 U.S.C. §2113(a), 215 Merchants Road;

Count 4:    *Entering a Credit Union with Intent to Commit a Larceny*, 18 U.S.C. §2113(a), 215 Merchants Road; and

Count 5:    *Credit Union Larceny*, 18 U.S.C. §2113(b), 215 Merchants Road.

5.      This indictment was filed on April 15, 2021.

## II.      FACTUAL BACKGROUND

### A.  *The Offenses*

6.      According to the discovery materials provided by the government, the ESL Federal Credit Union located at 518 E. Ridge Road in Irondequoit was robbed shortly before 11:00 a.m. on December 16, 2020. A teller reported that a man handed her a deposit slip and demanded money. Though no weapon was visible, she reported that the man had one of his hands in his pockets as if he had a gun. The teller gave the man $352.73 from the cash drawer ($100 of which was "bait money") along with a "money tracker" device. She described the individual as a black man, in his late 40's, wearing a navy, heavy suede winter jacket with the hood pulled up, khaki pants, and a surgical mask. She said he was taller than average, had a medium build, and was wearing black gloves.

7.      Another bank employee reported seeing the man in the vestibule of the same bank and having a brief conversation with him before the robbery occurred. This witness described him as a black male, approximately six feet tall with a thin build. The witness said he appeared to be in his mid-forties and was wearing a dark jacket with the hood up, a dark mask, and black gloves.

8.      The last signal received from the money tracker device was in the area of Seneca Manor Drive. Irondequoit Police responded to the location and ultimately located the broken tracker in the middle of the road. Police detained two men (neither of whom was Mr. Reed) who were subsequently displayed to witnesses and not identified as the perpetrator. Police dogs were utilized but not able to detect a trail.

9.      Police subsequently viewed surveillance video from the area surrounding the ESL Credit Union and noted a man exiting the bank following the robbery and entering a white, Buick sedan.

10.      Later that same day, at approximately 2:18 p.m., a bank teller at the ESL Credit Union at 215 Merchants Road reported that a man approached her station and demanded money. She described him as a male black wearing a black coat, black gloves, and a face mask. The teller said the man's hands were near his waistband area and she thought he had a weapon. In response to this demand, the teller gave the man approximately $2,000 with a dye pack hidden inside.

11.      Another customer at the Credit Union told police that he saw a man running away from the bank with "a red mist around him." He described the man as a black man wearing a blue jacket. He saw the man enter a car, which he believed was a white, four-door sedan "like a Chevy Lumina" with an out-of-state license plate. According to this witness' deposition, the witness provided the 911 operator with a license plate number for this vehicle of DPF7206.

12.     A customer who was waiting in line at the drive-thru described the suspect as a black male about six feet tall and about 200 pounds, wearing a black winter cap and black puffy coat. This witness estimated his age to be between 50 and 55 years old. The witness reported seeing the man enter a white, "big bodied," four-door Buick and drive away from the scene.

13.     A police report ("Investigative Action Report Case Update" dated 12/20/20) from Rochester Police Department (RPD) Officer Nicholas Thomas notes that "updated information was transmitted over the police radio that the suspect is described as a male black approximately 50 years old wearing a black jacket, black hat was last seen leaving the location in a white Buick century with the license plate of GPF7206." The report does not reveal the source of the "updated information" that the car was a Buick Century (as opposed to a generic, "four-door Buick" or a Chevy Lumina) or that the license plate number began with the letters "GPF" rather than "DPF" as originally provided to the 911 dispatcher.[1]

B.  *The Arrest*

14.     Officer Thomas reports that while *en route* to the location of the robbery, he observed a white Buick Century bearing "Ohio registration GPF7206" proceeding northbound on Rohr Street. Thomas further reported that he observed the vehicle pass a stopped school bus on the left and proceed down Clifford Street from Rohr Street. Thomas activated his emergency lights and pursued the vehicle for approximately 16 blocks until the Buick crashed into a tree and front porch at 601 Portland Avenue at approximately 2:28 p.m. Thomas noted that the driver of the Buick was Sylvester Reed. (A photograph of Mr. Reed's car at the scene of the accident is attached as Exhibit A.)

---

[1] Based on my review of the discovery, it is unclear whether there is an error in the written deposition from the witness who provided the license plate number or whether the deposition accurately reflects the witness' recollection of the number.

15.     Thomas described Reed as "dazed/unconscious due to the impact of the crash." He also noted that Reed needed police assistance exiting the vehicle. Body worn camera video shows the car with extensive damage surrounded by police yelling commands at the driver. When it becomes apparent that the driver is not able to open the car door, police approach the vehicle, pry open the driver side door and pull Mr. Reed out of the car onto the ground. According to initial radio communication between law enforcement vehicles regarding the accident, the driver of the vehicle appeared to be unconscious and "not following commands."

16.     Thomas reported seeing money "with what appeared to be red dye on it scattered on the floor board of the driver/passenger side of the vehicle."  Mr. Reed was transported from the scene of the accident to Strong Memorial Hospital by ambulance. The vehicle was towed to the public safety building. Police subsequently seized Mr. Reed's clothes from the hospital.

### C.  *Mr. Reed's Physical and Mental Condition*

17.     Ambulance personnel who arrived at the scene of the accident were advised by police that Mr. Reed had lost consciousness for 30 seconds to one minute. During the course of his treatment at the scene and *en route* to the hospital, Mr. Reed told ambulance personnel that he had been using cocaine and heroin throughout the day "and within the last hour." He also told them he "has given up and just wants to die," that he had gone to everyone for help, but gotten none and now "he would like to die."

18.     Regarding his physical condition, Mr. Reed complained of numbness and tingling in his legs, headache, back pain from his neck to his lower back, and pelvic pain radiating into both of his legs. He also reported that he had "rods, pins, and screws" in his spine from a previous car accident. On a pain scale of 1 to 10, Mr. Reed's pain was recorded as 10. A neurological

examination by ambulance personnel noted that Mr. Reed was suffering from memory loss and "dysarthria/slurred speech."

19.     Mr. Reed was seen in the Emergency Department at Strong Memorial Hospital on December 16, 2020 at 3:06 p.m. At that time, he reported having used cocaine and heroin within the last hour. A subsequent toxicology screen was positive for cocaine and opiates. He also complained of neck pain, back pain, and weakness of his upper and lower extremities. Mr. Reed reported not having taken his prescription medication for the preceding two weeks.

20.     Records from Strong Memorial Hospital note the following "active problem list" at the time of his admission on December 16, 2020: *hepatic cyst; renal cyst; rectal abscess; hyperplastic polyp of the large intestine; cervical spondylosis with myelopathy; right sided weakness; somnolence; rhabdomyolysis; dog bite of calf, right, sequela; pain of right lower extremity; and paroxysmal A-fib.* After being evaluated and treated for his immediate injuries with multiple x-rays, blood and urine analysis, and CT scans, Mr. Reed was advised that a scan of his abdomen and pelvis had detected a mass on his kidney indicative of "renal cell carcinoma." According to medical records, he was discharged at 7:38 that evening.

D.  *The Interrogation*

21.     As previously noted, Sylvester Reed was observed to be dazed and confused as a result of a car accident, after which he was transported to Strong Memorial Hospital. Police reports noted that he was at Strong from 1504 to 1951 (3:04 p.m. to 7:51 p.m.) on December 16, 2020.  Reports also note that he was delivered to the fourth floor of the RPD Public Safety Building to be interviewed at 7:55 p.m. and remained there until he was transported to booking at 9:55 p.m. the same day.

22.     Mr. Reed was brought to the PSB and escorted into an interview room by a uniformed RPD officer. Reed appears to be dressed in hospital attire. After being handcuffed to the table and complaining that he's cold, he drapes himself in a blanket and puts his head on the table. Later, while still alone in the room, Reed can be seen and heard talking to himself and crying.

23.     At approximately 8:29 p.m., Investigators Andrew Wigton and Stuart Shuman enter the room and begin their interrogation. Rather than immediately provide Reed with his *Miranda* warnings, however, the investigators initiate a conversation with him, which lasts for the next 17-18 minutes.[2] During the course of this pre-*Miranda* conversation, investigators ask Reed about his previous employment; his family; injuries he suffered from a serious car accident in 2010; his life-long addiction to cocaine and heroin; and his use of cocaine and heroin earlier that day. In response to Reed's comment that he didn't just get up this morning and say "I'm going to go into a bank and rob…" Shuman responds, "We'll talk about that in a second."

24.     During the course of this pre-*Miranda* conversation, Reed tells the investigators the following:

- He hasn't slept or eaten for days;
- He doesn't know the date, the day of the week, or the time (but does know it's December);
- He's homeless;
- He's been using cocaine and heroin "all day" and "all night," including earlier that day in the car before his arrest;
- He can't even remember how much he used;
- He'd been trying to get help for his drug addiction for weeks to no avail;
- His habit costs him $100-$200 every day;
- He is prescribed multiple medications (for his heart, blood pressure, high cholesterol), but hasn't taken them for weeks.

---

[2] Shuman leaves briefly during the initial few minutes of the conversation and returns with chips and candy.

25.     At approximately 8:32 p.m., Shuman gives Reed a bag of Doritos and some candy. Observing that he appears distraught, Shuman asks, "You all right, buddy?" Reed responds, *"No, I'm not."* Rather than ask any further questions on that subject, Shuman says, "Well, we're gonna talk to you." He goes on to say they're going to ask Reed some questions to find out more about him, find out what led him down this path, and to see if they can get him some help.

26.     Throughout the pre-*Miranda* conversation, Shuman attempts to build trust with Reed, sympathize with him, and encourage him to be honest with them. He tells him he's going to give him advice and he hopes Reed will listen to him. Shuman tells Reed that they're getting to know him and "we want to continue."

27.     Eighteen minutes after initiating the conversation, investigators prepare to provide Reed with his *Miranda* warnings. As a prelude, they minimize the significance of the warnings and convey to him that their conversation will continue after the warnings. For example, investigators suggest the rights are being read, not to provide him with critical information, but "because we're talking…because we're police," and because they want to find out more about him and what led him "down this path."

28.     Shuman tells Reed that after he reads him his rights, he's going to ask him two questions. Shuman tells him he can say yes or no. If he says yes, Shuman says they can learn more about him and at some point they may be asked their opinion about him and they're gonna tell people what they've learned from talking to him. Shuman then proceeds directly to read the *Miranda* warnings, without discussing the option of Reed saying no and declining to speak with them. When asked whether he will agree to talk to them, Reed responds "I don't mind."

29.     During the course of this interrogation, Mr. Reed continued to complain of being exhausted, cold, and generally unwell, both physically and mentally. As noted in the

accompanying affidavit, as a result of these circumstances, Mr. Reed was not able to understand and appreciate the *Miranda* warnings when they were read to him, nor did he knowingly and voluntarily waive his rights and agree to speak to law enforcement. *See* Exhibit B[3], affidavit from Sylvester Reed.

30.     At approximately 9:16 p.m., Investigators Wigton and Shuman concluded the interrogation and left Reed in the interview room. Alone in the room, Reed continues to say he hasn't eaten, hasn't slept in days, and needs help. He cries, wraps himself in a blanket, and lies down on the floor. At 9:54 p.m., a uniform officer wakes Reed up, handcuffs him, and takes him out of the room.

### E.   *The search warrant for the car*

31.     On December 17, 2020, Inv. Stuart Shuman submitted a sworn affidavit to Monroe County Court Judge Christopher Ciaccio in support of a search warrant for the 2004 Buick Century Reed was driving at the time of the accident. Judge Ciaccio authorized the search at approximately 12:30 p.m. A copy of this search warrant is attached as Exhibit C.

32.     In the affidavit submitted in support of the search warrant for the vehicle, Inv. Shuman explicitly relies on statements made by Mr. Reed during the course of his interrogation. Specifically, the affidavit includes the following assertions:

> *Sylvester Reed did end up confessing to being the subject who robbed both of the aforementioned banks this day. He identified himself from bank surveillance photos as the suspect for both aforementioned banks and also supplied us with some details of the bank robberies that were consistent with the known facts surrounding these respective investigations.*

> Exhibit C at (Bates stamped) p. 79.

---

[3] A signed and notarized copy of this affidavit will be filed under separate cover.

33.    On December 17, 2020 at approximately 1:15 p.m., the white Buick was searched by law enforcement, including Irondequoit Police Department Investigator Bradley Lape and a technician from the Rochester Police Department. According to Inv. Lape, police located and recovered the following property: black gloves; Reed's wallet and identification; court paperwork apparently unrelated to Mr. Reed; and over $1,000 in $5 and $50 bills stained with red dye. None of the serial numbers on the cash matched money that was known to have been stolen during the Irondequoit robbery.

34.    By letter to the government dated June 8, 2021, defense counsel requested notice, pursuant to Fed. R. Crim. Pro. 12(b)(4)(B), of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16. To date, the government has not responded to this request.

35.    Mr. Reed reserves the right to supplement his pretrial motions in response to the government's Fed. R. Crim. P. 12(b)(4) notice of its intention to offer any additional evidence, including the results of any forensic examination of the property recovered, or should other information be provided or discovered that raises additional legal issues.

### III.  MOTION TO SUPPRESS STATEMENTS

36.    As noted above, the government has not responded to the defense request for notice pursuant to FED.R.CRIM.P. 12(b)(4) of the evidence it intends to introduce in its case in chief at trial. The government has, however, provided the defense with a copy of a videotaped interrogation of Mr. Reed by Investigators Wigton and Shuman, which was recorded at the RPD Public Safety Building on the night of December 16, 2020. For purposes of the instant motion, the defense presumes that the government intends to use this evidence in its case in chief at trial. Mr.

Reed reserves the right to supplement this application should the government provide notice of its intent to use any additional statements allegedly made by Mr. Reed at trial.

37.     To the extent the government intends to offer these statements as evidence against him, Reed moves to suppress all statements allegedly made by him on the following grounds:

    A.     Under the totality of the circumstances, the statements were not "voluntarily made" pursuant to *Jackson v. Denno*, 378 U.S. 368, 377 (1964); *see also* 18 U.S.C. § 3501(a); and

    B.     The statements were not preceded by adequate warnings, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

38.     Moreover, Mr. Reed also moves to suppress any evidence recovered as a result of these unlawfully obtained statements, including any evidence resulting from the execution of the search warrant on the vehicle being driven by Mr. Reed at the time of his arrest. As noted above, the affidavit submitted in support of this search warrant explicitly relied upon statements allegedly made by Mr. Reed during the course of this unlawful interrogation. As such, evidence that flows therefrom is fruit of the poisonous tree and must also be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

39.     In *Miranda v. Arizona*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  384 U.S. at 444.

        Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating

> nature of the disclosures sought (the investigative intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

40.    In determining whether a defendant was in custody, a court must consider two questions.  First, "whether a reasonable person would have thought he was free to leave the police encounter at issue."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 371 (2004).  If so, the court must then consider whether the "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

41.    If the defendant is found to have been in custody, the court must then address whether he knowingly and voluntarily agreed to waive his constitutional rights and speak with the law enforcement officers.

42.    To establish a valid *Miranda* waiver the government must prove, by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The exclusionary rule prohibits the use of statements that were obtained through unlawful means.  *See Dunaway v. United States,* 442 U.S. at 200.

43.    A defendant challenging the voluntariness of a statement has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S. 368, 377 (1964). A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. *United States v. Anderson*, 929 F.2d 96 (2nd Cir. 1991).

In deciding whether a statement is voluntary, no one factor is dispositive; instead, the assessment must be based upon the totality of the circumstances. *See United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990); *United States v. Green*, 850 F.2d at 901. "In that context, 'knowing,' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). The inquiry centers around "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green*, 850 F.2d at 901–02.

44.     The prosecution bears the burden of showing voluntariness. *See Colo v. Connelly*, 479 U.S. at 168–69 (1986). Although this burden has been described as a "heavy" one, *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), the government may establish voluntariness by a preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

45.     In the instant case, the defendant submits that his statements were both involuntary and the product of custodial interrogation without the benefit of the *Miranda* warnings.

46.     As discussed above, Sylvester Reed was being pursued by police when he crashed into the porch of a house. Thereafter he was surrounded by police at gunpoint and pulled out of his motor vehicle. While he was lying on the ground injured and dazed as a result of the accident, he was handcuffed by the police. He remained in custody throughout his subsequent hospitalization at Strong Memorial Hospital, after which he was transported by law enforcement to the Public Safety Building where he was placed in a locked, interrogation room. Under these circumstances, Mr. Reed was clearly in custody when he was interviewed by police investigators and *Miranda* warnings were required.

47.     When Wigton and Shuman entered the interrogation room, Sylvester Reed had been in police custody for six hours, most of which was spent at the hospital where he was evaluated and treated for injuries suffered as a result of the motor vehicle accident. In addition to addressing his other medical issues, doctors had advised Mr. Reed that they had detected a mass on his kidney which was probably cancerous. He was exhausted, mentally and physically unstable, and distraught. Nonetheless, Investigators Wigton and Shuman proceeded to interrogate Mr. Reed.

48.     After engaging in a conversation with Mr. Reed for approximately 18 minutes, Inv. Shuman ultimately read him the *Miranda* warnings. During the course of this pre-*Miranda* conversation, however, Mr. Reed explained to Wigton and Shuman that he was physically ill and emotionally bereft; had been using cocaine and heroin all day, both before and after the robberies; and hadn't eaten or slept for days. *See supra at* ¶¶15-30. In response to Shuman's question, "You all right, buddy?" Reed had responded, "No, I'm not." Nonetheless, Shuman continued to engage Mr. Reed in conversation and administer the *Miranda* warnings as if none of that information had been conveyed.

49.     Under the totality of the circumstances, including Mr. Reed's weakened physical and mental condition (resulting from, among other things, lack of sleep, lack of sustenance, drug abuse, depression, exhaustion, and injuries suffered as a result of the car accident), any statements made to Investigators Wigton and Shuman should be suppressed as involuntary. *See United States v. Taylor*, 745 F.3d at 25; *see also Mincey v. Arizona*, 437 U.S. 385, 401-402 (1978).

50.     Accordingly, Reed moves for an order suppressing all alleged statements from use at trial. In the alternative, he requests an evidentiary hearing to resolve any disputed issues of fact. *See Jackson v. Denno*, 378 U.S. 368, 377 (A defendant challenging the voluntariness of a

confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness.") (1964); *see also* 18 U.S.C. § 3501(a).

51.     In addition, Mr. Reed moves to suppress any evidence recovered during the course of the search of his motor vehicle pursuant to the search warrant issued on December 17, 2020, the day after Reed's arrest and interrogation. *See* Exhibit C. As noted above, this warrant was explicitly based on statements made during what Mr. Reed contends was an unlawful, custodial interrogation. As such, evidence recovered as a result of the search warrant is fruit of the poisonous tree and must also be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963);

Conclusion

52.     Because there are multiple facts in dispute regarding the circumstances of Reed's interrogation, including his physical and mental condition and resulting ability to knowingly and voluntarily waive his *Miranda* rights and agree to speak to law enforcement officers, Mr. Reed requests an evidentiary hearing to resolve each of these issues, outside of the jury's presence, and sufficiently in advance of trial so as to allow the defense to adequately prepare for trial.  *See Jackson v. Denno*, 378 U.S. 368 (1984).

## IV.    MOTION FOR DISCOVERY AND INSPECTION

53.     Counsel recognizes that the defendant has been provided with voluntary discovery by the government.  To preserve the invocation of his statutory and constitutional rights, however, Mr. Reed moves for discovery of the following documents or information set forth below, not previously disclosed in the course of voluntary discovery and pursuant to Federal Rule of Criminal Procedure 16(a)(1) (A)(B)(C)(D) and (E):

> a.  Recordings of any communication between the various law enforcement officers and agencies involved in the investigation of these incidents and Mr. Reed's alleged commission of these offenses.

b. A copy or inspection of all results and reports of physical or mental examinations in the possession, custody or control of the government, including state and local agencies cooperating in this prosecution, which are material to the preparation of the defense or which are intended for use by the government as evidence-in-chief at the trial.

c. A written summary of testimony the government intends to use under Rules 702, 703 or 705 of the Federal Rules of Evidence during its case in chief at trial, including the witnesses' opinions, the basis and reasons therefor, and the witnesses' qualifications. This request shall also include reports and results of tests, examinations or experiments which are material to the preparation of this defendant's defense, whether they are intended for use by the government as evidence-in-chief at the trial.

d. Disclosure of any and all prior similar acts or convictions of a similar nature to the charge in this case, if any, which the government will seek to rely upon or introduce as evidence at the hearing or trial in this case for any purpose, including proof of knowledge or intent on the part of the defendant and the investigative reports of witnesses concerning such acts.

e. Any and all evidence in the government's possession, or which could be reasonably acquired by the government, that would be favorable to this defendant on the issues of guilt or sentencing under the principles of *Brady v. Maryland,* 373 U.S. 383 (1963), *Giglio v. United States,* 405 U.S. 150 (1972) and *Kyles v. Whitley,* 514 U.S. 419 (1995). The defense requests any information which would tend to attenuate, exculpate, exonerate, or mitigate this defendant's involvement in the circumstances involved in the Indictment or to impeach a prosecution witness. *United States v. Avellino,* 136 F.3d 249 (2d Cir. 1998) and *Tate v. Wood,* 963 F.2d 20 (2d Cir. 1992). The defense further requests that the government inquire of the agents and witnesses involved in the investigation and prosecution of this indictment regarding the existence of such material.  *Avellino, id.*; *United States v. Payne,* 63 F .3d 1200 (2d Cir. 1995).

   i. Pursuant to *Brady, Giglio, Kyles, Avellino and Tate,* the defendant specifically requests any and all information which tends to attenuate or mitigate the defendant's involvement in the offense, including any information that would tend to show that:

   - The defendant was a minimal or minor participant in the offense;
   - The defendant demonstrated an acceptance of responsibility for the offense;
   - The defendant's assistance in the investigation or prosecution of another person who may have committed an offense;
   - Evidence that the defendant may have committed the offense to avoid a perceived greater harm;

- Evidence that the defendant committed the offense because of coercion, duress, or entrapment; or
- Evidence that the defendant committed the offense while suffering from a reduced mental or emotional capacity including, but not limited to impairment as a result of drugs and/or alcohol.

f. The government's position on the applicable Sentencing Guidelines should the defendant be convicted of the offense charged.

g. Pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the defendant requests written notification of any evidence that the government intends to use in its case-in-chief that may, in any way, be subject to a motion to suppress or which the defendant is otherwise entitled to discover pursuant to Rule 16.

h. The defendant requests that all physical evidence, including tape or video recordings made during the investigation of this matter, including recordings that might otherwise be destroyed as part of a normal business practice, be preserved and maintained.

i. The defendant further requests that the Court direct the government to make available for inspection and/or copying all audio or visual recordings, surveillance logs, or other documentation and information of any type whatsoever obtained in the investigation of this pending indictment or felony complaints or indictments specifically pending against all confidential informant and cooperating witnesses, and all others identified within this indictment as known and unknown to the grand jury which document or make reference to conversations including or observations of this defendant or those identified as others, known and unknown to the grand jury in this indictment.

54.    The defendant further requests an order from this Court directing the government to disclose, pursuant to Rule 16(a)(1)( c) and/or permit the defendant to inspect and copy books, papers, documents, photographs, tangible objects, or similar items which are within the possession, custody or control of the government, specifically including the following:

j. All books, papers, documents, or tangible objects the government plans to offer into evidence at trial;

k. Any and all property in the possession of the government or its agents or seized by the government or its agents or alleged by the government to belong to the defendant;

l.   Any and all charts, maps or other diagrams  which the government intends to use at trial or which the government, or any other law enforcement authorities are in possession of and which were made or used during the investigation of this matter for the preparation of the instant indictment;

m.   The logs or investigative notes of any United States, or New York State law enforcement agent prepared in the course of the surveillance of any property, vehicle or person connected with the investigation of this case including;

n.   Any and all supporting documents concerning the investigative notes of whatever nature of each and every government agent, or New York State agent (include parole personnel), who participated in the alleged surveillance, search, seizure and arrest of any person, property or vehicle in connection with this indictment.

55.    The defendant also requests that the government provide him with copies of any and all surveillance photographs, if any, taken by any law enforcement agents, including the Federal government, the New York State Police, the City of Rochester Police Department, the Irondequoit Police Department, or any other law enforcement agencies, which relate to the investigation of the events underlying the present indictment.

56.    The defendant further notes that pursuant to Rule 16 the government's duty to disclose the requested materials herein is a continuing one and the defense specifically requests that any and all materials requested herein which are acquired or come to the attention of the government subsequent to the disposition of the present motion be promptly supplied to the defendant.

57.    With respect to any items demanded by the defense which the Court in its discretion disallows disclosure, it is respectfully requested that the Court, in the interests of justice, require the government to disclose the existence of such items and supply copies to the Court, *in camera*, so that these materials and information, can be preserved and their existence established.

## V.    MOTION FOR DISCLOSURE OF BRADY MATERIAL

58.    The defendant moves this court to grant an order compelling the prosecution to disclose to the defendant all evidence in the possession, custody or control of the prosecution the existence of which is known, or by the exercise of due diligence should become known, to the attorney for the prosecution.  This motion is made under the authority of *Brady vs. Maryland*, 373 U.S. 83; *Giglio v. United States,* 405 U.S. 150 (1972); and *Kyles v. Whitley*, 514 U.S. 419 (1995).

59.    The information requested should include all evidence which may be favorable to the defendant and material to the issue of guilt or punishment, or bears upon and could reasonably weaken or affect any evidence proposed to be introduced against the defendant by the prosecution (including the credibility of any government witness), or bears in any material degree on the charges contained in the indictment or as relevant to the subject matter of the indictment and prosecution under it, or which may lead to exculpatory material or, in any manner, may aid the defendant in the ascertainment of the truth.

60.    This request includes any written or recorded statements, admissions or confessions made by any witness, co-defendant or co-conspirator whether named or unnamed which may be exculpatory, non-incriminatory, or otherwise favorable to this defendant, or any summaries, synopses, notes, memoranda or resumes thereof, regardless of whether such statement were reduced to writing and regardless of whether the government intends to use such statements at trial including:

      a.    The name and address of such witnesses and the names and addresses of any other witnesses who might be favorable to the defendant;

      b.    Any and all written statements made by any witness who has been interviewed by an agent of the government in connection with the subject matter in this case and whom the government presently does not intend to

call at trial, regardless of whether such statement has been signed or otherwise adopted or approved by said witness as well as any stenographic, mechanical or electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by said witness to an agent for the government;

c. The names and addresses of all persons who may have some knowledge of the facts of the present case or who have been interviewed by agents of the government in connection with the case;

d. The criminal records or any list or summary reflecting the criminal records of all persons the prosecution intends to call at trial;

e. Any notes, memoranda, summaries, reports or statements of any kind prepared by agents or the government in connection with the investigation of this case;

f. Any notes, memoranda, summaries, reports or statements of any kind prepared by persons other than agents of the government in connection with the investigation of this case;

g. Information which can be used to impeach government witnesses including matters which might or could motivate the testimony of such persons, including copies of plea agreements or other agreements providing for cooperation by such witness in exchange for favorable treatment by the government, as well as any acts of criminal, immoral or vicious conduct by said persons during their lifetime and factors which might have a bearing upon any bias or hostility of such person toward the defendant;

h. Any record of previous arrests or convictions or any other evidence or information demonstrating participation in dangerous, vicious, immoral or criminal behavior on the part of any persons intended to be called as witnesses by the prosecutor, including but not limited to criminal records, police personnel records, or other memoranda;

i. Any statements known to be false or erroneous made to a public servant engaged in law enforcement activity or a grand jury or a court by persons intended to be called as witnesses;

j. Any evidence, testimony, transcript, statement or information indicating that any prospective government witness on any occasion gave false, misleading or contradictory information regarding the charge at bar or any related matters, to persons involved in law enforcement or to their agents or informers;

k.    Any evidence, testimony, transcript, statement or information indicating that any prospective government witnesses have given statements which are or may be contradictory to each other;

l.    Any information recounting a misidentification of the defendant as a perpetrator of the crime(s) charged or indicating a failure on the part of any potential witness to identify the defendant as the perpetrator of the crime(s) charged;

m.    Any information indicating that any prospective government witness has or had a history of mental or emotional disturbance  *See Pennsylvania v. Richie*, 480 U.S. 39 (1878); *United States v. Pallot*, 43 Fed Appx 473 (3ʳᵈ Cir. 2002)

n.    Full disclosure of any consideration, promise of consideration, or expectation of consideration offered to any prospective government witness, including but not limited to, leniency, favorable treatment, assistance with respect to any pending legal proceeding, or any reward or other benefit whatsoever which will of could be realized by the witness as a result of their testimony;

o.    Any threats, express or implied, direct or indirect, made to any government witness, including criminal prosecution or investigation, any change in the probationary, parole, or custodial status of the witness, or any other pending or potential legal disputes between the witness and the government or over which the government has a real, apparent, or perceived influence;

p.    Complete information of each occasion when each witness who was or is an informer, accomplice, or co-conspirator has testified before any court or grand jury, including date, caption, and indictment number of the case;

61.    The defendant also demands any information to the effect that all or some of the evidence which may be utilized by the government at trial was illegally or improperly obtained or was obtained even partially as the result of the improper acquisition of some other evidence or information.

62.    All evidence in the possession, custody or control of the government or any police agency, the existence of which is known to the government, or which by due diligence may become known to the government, which may be, or may tend to be favorable or exculpatory to

the defendant, and which is or may be material to the issue of guilt or punishment, must be disclosed to the defense.

63.     Counsel specifically reserves the right to make any additional requests for material covered by *Brady vs. Maryland, supra*, at the time this motion is argued, or at such other time as the existence of such material shall become known to counsel or the defendant.

64.     The defendant requests that the Court instruct the prosecutor in his search for "*Brady*-type" material that he specifically interview those members of the law enforcement agency involved in the preparation of this case for prosecution and who therefore had contact with any witness whom the prosecution intends to call upon the trial of this action for the type of information in their files relative to the requests made above.

65.     The defendant further requests that the Court instruct the government, in its search for evidence that could be used to impeach the credibility of any law enforcement witness, to independently and thoroughly review records regarding the investigation of any previous allegations of professional misconduct made against any law enforcement officer who may testify as a witness at a hearing or trial to determine whether the officer's conduct, including any statements made during the course of the investigation, may bear upon the witness' credibility.

## VI.  FED. R. EVID. 404(b)

66.     Pursuant to FED. R. CRIM. P. 12(b) and FED. R. EVID. 404(b), Reed requests that the government notify him of any evidence that the government contends would be admissible under FED. R. EVID. 404(b).  Such notice would permit Reed to file appropriate motions to suppress, prior to trial, any evidence the government contends would be admissible to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of a mistake."  FED. R. EVID. 404(b).

## VII.  FED. R. EVID. 608 & 609

67.     The defense requests disclosure of all evidence of convictions and prior bad acts

committed by Reed that the government intends to use for impeachment of the defendant, should

he testify at trial, pursuant to FED. R. EVID. 608(b) and 609(a).

## VIII.  DISCLOSURE OF WITNESS STATEMENTS

### Contents of Disclosure

68.     Mr. Reed moves for disclosure of witness statements pursuant to 18 U.S.C. § 3500

("*Jencks Act*") and FED. R. CRIM. P. 26.2.  The Second Circuit has interpreted this statute to include

a substantially verbatim statement of a witness' words as recorded by a government agent if they

could fairly be deemed to reflect fully and without distortion what had been said to a government

agent.  *United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995).

69.     The defense further requests an order requiring production of *Jencks Act* materials,

namely all statements and reports in the possession of the United States which were made by

government witnesses or prospective government witnesses and which relate to the subject matter

about which those witnesses may testify, as per the *Jencks* Act, 18 U.S.C. § 3500, and Rule 26.2 of

the Federal Rules of Criminal Procedure.

A.  The term "statements" shall include:

(i) Any written statement made by a witness and signed or otherwise
    adopted or approved by him;

(ii) Stenographic, mechanical, electronic or other recording, or
     transcriptions thereof, which are a substantially verbatim recital of
     an oral statement made by a witness and recorded
     contemporaneously with the making of such oral statement;

(iii)  A statement, however taken or recorded, or a transcription thereof, if any, made by a witness to a grand jury;

(iv)  Recorded statements which fairly and fully reflect, without distortion, comments made to a government agent by a witness, *United States v. Scotti,* 47 F.3d 1237, 1249 (2d Cir. 1995);

(v)  Any and all rough notes of witness interview(s) taken or obtained in any investigation of the defendant including federal, state, local, and other investigations whether or not the contents thereof have been incorporated in official records, *See id.*;

(vi) Any notes and memoranda made by government counsel during the interview of any witness(es) intended to be called by the government in their direct case, *Goldberg v. United States*, 425 U.S. 94, 101-108 (1976); and

(vii) All surveillance reports made or adopted by a witness.  *United States v. Petito*, 671 F.2d 68, 71 (2d Cir. 1981).

**Timing of Disclosure**

70.    Prompt pre-trial delivery of *Jencks* material will insure that Reed' fundamental rights to a fair trial and due process are safeguarded. Therefore, the defense seeks production of the *Jencks* material one month prior to trial for the purposes of judicial economy, to expedite discovery and the trial of this case.

71.    Although a District Court may not ordinarily compel disclosure of *Jencks* material prior to the conclusion of a witness' direct examination, early disclosure of *Jencks* material obviates trial interruptions and permits defense counsel to study the disclosures.  *See United States v. Campagnuolo*, 592 F.2d 852, 858 n.3 (5th Cir. 1979).  Courts have, on a case-by-case basis, invoked their discretion to require production of *Jencks Act* statements in advance of the trial so that unnecessary delays will not take place during the course of the trial.  *See United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974); *United States v. Feola*, 651 F. Supp. 1068, 1139-40 (S.D.N.Y. 1987).

72.     Wherefore, the defense requests that the Court order disclosure of the *Jencks* material one month prior to the scheduled trial date.

## IX.  PRESERVATION OF ROUGH NOTES

73.     Mr. Reed moves for an Order of this Court requiring all government agents and officers who participated in the investigation in this case to retain and preserve all rough notes taken as part of their investigation, whether or not the contents of the notes are incorporated in official records.

74.     This motion is made so that the trial court can determine whether disclosure of the notes is required under *Brady*, *Agurs*, *Giglio* and/or the Jencks Act.  *United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980); *United States v. Eleusma*, 849 F.2d 76 (2d Cir. 1988), *cert. denied*, 489 U.S. 1097 (1989); *United States v. Koskerides*, 877 F.2d 1129 (2d Cir. 1989).

75.     This motion is intended to put the government and its agents on notice that, from this point on, any and all rough notes referred to above should be preserved.

## X.  RESERVATION OF RIGHTS

76.     Mr. Reed respectfully requests the opportunity to supplement this pleading should the government's response raise additional issues of fact or law not sufficiently addressed herein.


Dated: August 5, 2021
        Rochester, New York

                                    Respectfully submitted,

                                     /s/ *Sonya A. Zoghlin*
                                    Assistant Federal Public Defender
                                    28 E. Main Street, Suite 400
                                    Rochester, New York 14614
                                    585-263-6201
                                    sonya_zoghlin@fd.org
                                    Attorney for Sylvester Reed

To: Sean Eldridge, AUSA